UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILLIAN PIERCE, NICOLE WADE, FANTASY DECUIR, DAMENA PAGE, VINCENT KEITH BELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, VICKI HENNESSAEY, MICHELE FISHER, PAUL MIYAMOTO, DOES 1-50,<br><br>Defendants. | Case No. 19-cv-07659-JSW<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 91, 94, 98 |

Now before the Court are the two motions for summary judgment filed by Defendants City and County of San Francisco, Vicki Hennessy, Michele Fisher, and Paul Miyamoto (collectively, "Defendants") regarding the outdoor recreation claim and the cross-gender search claim. Also before the Court is the motion for summary judgment filed by Plaintiffs Jillian Pierce, Nicole Wade, Fantasy Decuir, Damena Page, and Vincent Keith Bell (collectively, "Plaintiffs") regarding the outdoor recreation claim.

For good cause shown, the Court GRANTS the motions for summary judgment filed by Defendants and DENIES the motion for summary judgment filed by Plaintiffs.[1]

---

[1] The Court GRANTS the parties' several requests to file confidential matters under seal. (Dkt. Nos. 75, 77, 82, 93, 96, 99, 102, and 104.) The Court also GRANTS Defendants' request for additional pages. (Dkt. No. 97.) Lastly, the outstanding motions for class certification are DENIED as they are rendered moot by this Court's ruling herein on the motions for summary judgment. (Dkt. Nos. 73, 76.)

**BACKGROUND**

The City and County of San Francisco designed and constructed County Jail No. 2 ("CJ2") located at 725 7th Street in San Francisco, without outdoor recreation space. Initially the building was designated as a work furlough facility, but it is now utilized exclusively as a jail. All pretrial detainees housed in CJ2 have not been provided outdoor recreation opportunities since 1994 when the facility opened. Plaintiffs, past and present pretrial detainees at CJ2, allege that the County has a pattern and practice of deliberately denying detainees meaningful recreational opportunities. Although CJ2 has a gym and an atrium, Plaintiffs allege that neither provides direct sunlight and that, prior to the onset of Covid-19, pretrial detainees were routinely taken to the gym at nighttime after the sun had set. The atrium provides filtered light and no fresh air. Plaintiffs allege that the space was not made available to pretrial detainees regularly, and prior to Covid-19, was only made available for the limited purpose of legal visits. Plaintiffs allege that most pretrial detainees have never been to the atrium. Post onset of Covid-19, Plaintiffs allege that the gym has not been used for inmate recreation.

Separately, Plaintiffs also allege that between March 30, 2018 and August 21, 2020, Defendants indiscriminately subjected 414 female pretrial detainees housed in CJ2 to unreasonable and non-emergent unclothed body cavity searches in the presence of male deputies and other women. Plaintiffs claim that these searches occurred eight times in less than two years, thereby establishing a pattern or practice of subjecting the female pretrial detainees to searches in violation of their constitutional rights and in violation of the Bane Act. Plaintiffs allege that deputies ordered the female detainees to congregate together outside of the cells and then were taken in groups of three to separate bathroom stalls where they were ordered to remove their clothing, squat, cough, open their mouths, lift their breasts, and spread open their anuses for visual inspection for contraband materials. Plaintiffs claim that at all times these visual inspections were conducted by female deputies but in the presence and view of between three and seven male deputies. They also allege the searches were random, unnecessary, and unjustified in violation of the jail manual and federal law.

The Court shall address other specific facts in the remainder of its order.

2

**ANALYSIS**

**A.      Legal Standard on Motion for Summary Judgment.**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial.  If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.*

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).

**B.      Outdoor Recreation Claims.**

It is undisputed that CJ2 lacks an outdoor recreation area and is located in downtown San Francisco.  It is also therefore undisputed that the facility cannot provide outdoor recreation opportunities to pretrial detainees in custody there.  Plaintiffs allege that the denial of outdoor recreation is a violation of their Eighth and Fourteenth Amendment protections pursuant to 18 U.S.C. section 1983, as well as implicating supervisory liability under *Monell*, and a violation of the California Bane Act, California Civil Code section 52.1(b).  Plaintiffs pray for relief, including punitive damages.

Section 1983 provides a cause of action for violation of a plaintiff's constitutional rights by

persons acting under the color of state law. *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir. 2009). Plaintiffs contend that the lack of outdoor recreation options violates the Eighth and Fourteenth Amendments. The Eighth Amendment applies only to post-conviction inmates. Consequently, the Court shall review the Fourteenth Amendment jurisprudence for Plaintiffs who are all pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535, n.16 (1979) (holding that when pretrial detainees challenge the condition of their confinement, the question is whether the conditions amount to punishment in violation of the Due Process Clause of the Fourteenth Amendment); *see also Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998 (citing *Bell*, 441 U.S. at 535 n.16) (holding that the claims of pretrial detainees "are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment."). The Fourteenth Amendment, furthermore, provides more protection than the Eighth Amendment because is "prohibits *all* punishment of pretrial detainees." *Vasquez v. County of Kern*, 949 F.3d 1153, 1163-64 (9th Cir. 2020) (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004)).

For any particular governmental action to constitute punishment "(1) that action must cause the detainee to suffer from harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Demery*, 378 F.3d at 1029. "If a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. In order to "constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Demery*, 378 F.3d at 1030.

Under the Supreme Court's decision in *Bell*, a jail's primary obligations are to provide "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Bell*, 441 U.S. at 529 n.11. The Ninth Circuit has held that courts must consider the conditions of confinement and has confirmed, "time and time again, that the Constitution requires jail officials to provide outdoor recreation opportunity, *or otherwise meaningful recreation*, to prison inmates." *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018) (emphasis added). The undisputed record in this case indicates that there is no option for outdoor exercise or outdoor recreation for inmates held in CJ2.

4

Thus, the only determination the Court must make is whether CJ2 provides otherwise meaningful, indoor exercise or recreation to its inmates.

Although the Constitution provides that jails cannot deny inmates the opportunity for exercise, the Ninth Circuit has declined to determine that the Constitution requires a specific minimum amount of time for recreation for pretrial detainees. *See Pierce v. County of Orange*, 526 F.3d 1190, 1212 (9th Cir. 2008). In *Pierce*, the jail had only provided ninety minutes of indoor exercise per week. The court held that did not satisfy constitutional minimum and reinstated a prior injunction which required that the jail provide inmates two hours of indoor recreation per week. *Id.* at 1212-13; *see also Candler v. Santa Rita Cty. Jail Watch Commander*, No. 11-CV-01992-CW, 2015 WL 333298, at *9 (N.D. Cal. Jan. 26, 2015) (holding that, under *Pierce*, providing two hours of recreation weekly met constitutional standards). Further, "the constitutionality of conditions for inmate exercise must be evaluated based on the full extent of the available recreational opportunities." *Norbert v. City and County of San Francisco*, 10 F.4th 918, 929 (9th Cir. 2021).

Accordingly, the Court finds that the provision of three hours of indoor recreation time per week, distributed over time, does not violate constitutional limitations and is what the applicable state regulations require. Title 15 of the California Code of Regulations sets out the requirement of a minimum of three hours of recreation weekly for long-term inmates. 15 Cal. Code Regs. § 1065. The regulations specify that the recreation time must be "distributed over seven days." *Id.* The record before this Court indicates that although CJ2 provided three hours recreation time weekly to inmates, at least in 2020, it failed to distribute those hours over the seven days. (Declaration of Andrew Chan King, ¶ 9; Ex. L.) Defendants provide undisputed evidence that the jail used to provide structured group movement and exercise classes three days a week for an hour, and also that the gym was available to inmates. (Declaration of Marcela Espino ("Espino Decl."), ¶ 2; Declaration of Jason Jackson ("Jackson Decl."), ¶ 11.) The gym has a treadmill, bikes, and resistance machines as well as a ping pong table and board games. The gym also has a radio for inmates' use and four bathroom stalls and sinks from which inmates can obtain water. (Jackson Decl., ¶ 7.) Exercise at the gym and structured group exercise classes have been suspended due to

5

1  Covid-19 protocols.  (*Id.* at ¶ 12; Espino Decl., ¶ 5.)  Defendants indicate their intention to restart
2  exercise classes in the fall of 2022.  (Espino Decl., ¶ 6.)
3        In addition, the evidentiary record provides that inmates in the general population have
4  several hours of free time per day (generally 4.5 hours during the weekdays and 8 hours during the
5  weekend) to use the common areas in their residential pods.  (Jackson Declaration at ¶ 10.)
6  During this free time, inmates are not confined to their cells and are permitted to recreate,
7  including walking around the pod, reading, watching TV, playing board games, and making phone
8  calls.  (*Id.*)  In addition, during this time, inmates are permitted to exercise in the pods, including
9  doing push-ups, sit ups, squats, planks, lunges, etc.  (*Id.*)  None of the named plaintiffs dispute that
10 they were permitted this recreation time.
11       Based on this Court's finding that the hours provided to inmates at CJ2 are sufficient to
12 pass constitutional muster under existing precedent, the Court similarly finds that the *Monell* claim
13 and the Bane Act claims, which depend upon a finding of unconstitutional treatment, similarly
14 fail.  The Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs'
15 motion for summary judgment regarding the outdoor recreation claim.

**C.  Cross-Gender Search Claim.**

Defendants also move for summary judgment on Plaintiffs' claims relating to the cross-gender viewing by male deputies of non-emergent unclothed body cavity searches performed by female deputies on 414 female pretrial detainees.  Plaintiffs claim that these searches occurred eight times in less than two years, thereby establishing a pattern or practice of subjecting female pretrial detainees to searches in violation of their Fourteenth Amendment rights.  Plaintiffs also allege related claims for *Monell* and supervisory liability in violation of 42 U.S.C. section 1983, and violation of the Bane Act.

The search policy of the San Francisco Sheriff's Department issued on January 24, 2004 defines the policies and procedures of various kinds of searches, including physical body cavity searches.  "Strip Search" is defined as "[a] search that requires a person to remove or arrange some or all of their clothing to permit a visual inspection of the breasts, buttocks or genitalia of such person.  A strip search may also include a visual inspection of the person's body cavities."

6

(Declaration of Raymond R. Rollan ("Rollan Decl."), ¶ 5, Ex. D at 1.E.)  By contrast, a "Physical Body Cavity Search" is defined as "a physical intrusion into a body cavity, such as the mouth, stomach, rectum, or vagina, for the purpose of discovering any object concealed in the body cavity.  This type of search requires a valid search warrant and must be conducted by medical employees at a medical facility." (*Id.* at ¶ 1.C.)  The policies also provide that pre-sentenced, booked inmates "may be strip searched at any time if there is reasonable suspicion and supervisor approval on the Strip Search Authorization form prior to the strip search." (*Id.* at ¶ III.C.)  However, prior approval of the strip search is not necessary where there is a "legitimate reason such as a security search of their housing unit exists to conduct another search; or [if the inmate] has been found to possess contraband during a prior search." (*Id.*)   Sentenced inmates, on the other hand, "may be strip searched at any time as part of a security search." (*Id.* at ¶ III.D.)

The policies further provide that "[a]n SFSO sworn employee will take all reasonable measures to minimize the extent to which strip searches intrude on an individual's privacy." (*Id.* at ¶ IV.)  Further, "[a]ll strip searches shall be conducted in a private location, such that persons not participating in the search cannot observe the person being searched." (*Id.* at ¶ IV.A.1.)  Lastly, the policies specifically provide that "[a]ll SFSO sworn employees present at the search shall be of the same gender identity as the person being searched except in emergency situations." (*Id.* at ¶ IV.A.3.)

The undisputed evidence before the Court, including video footage of one of the searches conducted on November 20, 2018, indicates that female pretrial detainees may have been subjected to incidental viewing by male deputies while undergoing strip searches.  Male deputies who were on duty in the pod during the searches were tasked with securing the pod and searching common areas while female deputies took groups of two to three inmates to a lower level bathroom with exterior glass walls for the searches.  (Declaration of Lt. Brian Krol ("Krol Decl."), ¶¶ 11-15.)  All SFSO deputies are trained to minimize exposure of the inmates during the strip search process to anyone outside of the bathroom stall area, including blocking any opening with their bodies while a strip search is conducted.  (*Id*. at ¶ 19.)

While the evidence demonstrates that the searches themselves were carried out by female

deputies in private bathroom or shower stalls, any viewing by male deputies or others of the inmates was incidental. Plaintiffs testified that they could see male deputies in the pod while they were strip searched, but none testified that the male deputies were present in the immediate area of the searches or that they made lewd or inappropriate comments. Of the named plaintiffs, only Plaintiff Pierce testified that she had observed male deputies looking in the direction of the bathroom stalls. (Rollan Decl., Ex. G at 133:4-14; 135:22-25.) The video footage viewed by the Court evidenced several male deputies present in the pod, but in a separate location where they walked around and remained preoccupied by other tasks. (*Id.*, Ex. H.) There is no evidence in the record that the male deputies were present at the site of the strip searches or were staring into the stalls where the searches actually took place. (*See id.*)

Plaintiffs allege that the potential viewing of the strip searches by male deputies violated their Fourteenth Amendment right to privacy and bodily autonomy. The Ninth Circuit has held that the right to privacy, including the right to shield one's naked body from view by persons of the opposite sex, applies in the prison context. *See, e.g., Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988) (holding that "incarcerated prisoners retain a limited right to bodily privacy. Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity.") (citing *Grummett v, Rushen*, 779 F.2d 491, 494 (9th Cir. 1985)); *see also Cumbey v. Meachum*, 684 F.2d 721, 713 (10th Cir. 1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether."). The Court must analyze the claim by deciding whether the impingement on inmates' right to privacy by having male deputies monitor the pod while female deputies conducted the body searches is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 87 (1987).

In *Grummett*, the Ninth Circuit considered an action brought by male inmates who alleged that female guards were viewing them in states of partial or total nudity while dressing, showering, being strip searched, using the toilet, all in violation of their right to privacy. 889 F.2d at 492. Female guards were not assigned to positions of frequent surveillance of the inmates but were found to be in positions requiring only infrequent and casual observation, or observation from a

8

distance. *Id.* at 494. The Ninth Circuit concluded that inmates had not demonstrated "restricted observations by members of the opposite sex [were] so degrading as to require intervention by this court" and ultimately found there was no Fourteenth Amendment violation. *Id.* Similarly, in *Michenfelder*, the Ninth Circuit considered a challenge to frequent, routine, cross-gender strip searches on the grounds they were unreasonable and violated the inmates' right to privacy because they were conducted in the company of female deputies. 860 F.2d at 333. In that case, although the female officers did not perform the non-emergent searches, they were stationed in positions controlling cell doors and monitoring the tiers via a video screen. *Id.* at 330. By virtue of their surveillance responsibilities, female officers could have, at most, an "indistinct, limited view" of the inmates through small windows in the cell doors or by watching the video monitors. The court held that strip searches that involve infrequent or casual observation by members of the opposite gender, or where opposite gender observation is from a distance, do not unreasonably infringe upon the inmates' right to privacy. *Id.* at 334.

So too the Court finds here that the undisputed evidence indicates that male deputies were in a position to have only infrequent or casual observation of the inmates at CJ2 while the female officers performed strip searches. This, under binding Ninth Circuit precedent, is insufficient as a matter of law to constitute an infringement of the inmates' Fourteenth Amendment rights. Controlling precedent does not require that all opposite gender guards be removed from the pod anytime a visual strip search is conducted in the bathrooms or shower stalls. The Court finds that a reasonably jury could not find that incidental and casual viewing by the male deputies was so degrading as to amount to a constitutional violation.

Based on this Court's finding that the incidental cross-gender viewing during strip searches conducted at CJ2 pass constitutional muster under existing precedent, the Court similarly finds that the *Monell* claim and the Bane Act claims, which depend upon a finding of unconstitutional treatment, similarly fail. The Court GRANTS Defendants' motion for summary judgment on the cross-gender search claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs' motion for summary judgment regarding the outdoor recreation claim and GRANTS Defendants' motion for summary judgment on the cross-gender search claim. A separate judgment shall issue and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: December 5, 2022

_____
JEFFREY S. WHITE
United States District Judge